MacQUEEN *v.* CITY COMMISSION OF CITY OF PORT HURON.

1. SCHOOLS AND SCHOOL DISTRICTS—CONSTITUTIONAL LAW—POLICY OF STATE—STATE LEGISLATURE.

   The Constitution of Michigan has delegated to, and lodged in, the State legislature the control of the public school system, and the general policy of the State has been to retain such control, through local State agencies independent of, but closely associated with, the local government.

2. SAME—SPECIAL ACTS—GENERAL SCHOOL LAW.

   While, to meet the necessities of certain cities and villages, the legislature had the power and did pass many local

and special acts, sometimes as a chapter in the local charter, granting unusual powers to the board of education, yet the latter retained its entity as a *quasi* corporation, and was governed, aside from the plain provisions of the special act, by the general school law (section 4774, 2 Comp. Laws, 2 Comp Laws 1915, § 5760).

3. SAME—ELECTORS—CITY CHARTERS—POWER TO CHANGE SCHOOL CHARTER—HOME-RULE ACT.

It was not within the power of the electors of a city to change the corporate powers of the local board of education through the adoption of a new charter under the home-rule act (section 4, Act No. 279, Pub. Acts 1909, 1 Comp. Laws 1915, § 3307), as public school matters were expressly exempted from its operation.

4. SAME—CORPORATE ENTITY—POWERS AND DUTIES.

That the new charter, in the reorganization, provided for and furnished qualified officials to carry out the obligations relating to school matters, and designated them by other titles, is immaterial so long as the new local bodies or officials were vested with the same powers and burdened with the same duties in relation to school matters as those designated under the old charter.

5. MUNICIPAL CORPORATIONS—CITY CHARTER—CHANGE OF WARDS—PRESUMPTIONS—NUMBER OF MEMBERS OF SCHOOL BOARD.

Where, under the old charter, the city council had authority to lay out and change its wards, and authority was granted by the legislature to the people to reduce the number of wards to one in adopting a new charter, it must be presumed that it was contemplated that the number of members of the board of education might change accordingly.

6. SAME—MEMBERS OF SCHOOL BOARD—DE JURE OFFICERS.

Where members of the board of education of a city were selected in compliance with the requirements of the old, as well as the new, charter, and they and their successors have continued to act as such for over five years, they are *de jure* school officers with all the rights, powers, and duties granted to, and imposed upon, school boards, under the provisions of section 5, Act No. 31, Pub. Acts 1909 (2 Comp. Laws 1915, § 5652).

7. SAME—SCHOOL BONDS—GENERAL ACT.

The provisions of a city charter authorizing the city to bond for school purposes and precluding the school district from

doing so, were repealed by Act No. 150, Pub. Acts 1915 (2 Comp. Laws 1915, §§ 5865, 5866), such act being in harmony with the general policy of the State in educational matters and tending towards greater uniformity in the school laws.

8. CONSTITUTIONAL LAW—SCHOOLS AND SCHOOL DISTRICTS—CLASSIFICATION—STATUTES.

It is settled law in Michigan that a general law is not unconstitutional because based upon classification of school districts according to population. *Burton* v. *Koch,* 184 Mich. 250.

9. SAME—STATUTES—TITLE—OBJECT.

Act No. 150, Pub. Acts 1915, is not unconstitutional in that its object is not expressed in its title, and in that it embraces more than one subject.

10. STATUTES—CONSTRUCTION—STATE LEGISLATURE.

It is a cardinal rule that the legislature must be held to intend the meaning which it has plainly expressed, and in such case there is no room for construction or attempted interpretation to vary such meaning.

11. MUNICIPAL CORPORATIONS — POWERS — SCHOOL BONDS — ULTRA VIRES—STATUTES—INJUNCTION.

The issuance of bonds for school purposes by a city after the enactment of Act No. 150, Pub. Acts 1915, transferring said authority from the city to the school authorities, was *ultra vires,* and a decree restraining such contemplated action is entered in the appellate court.

Appeal from St. Clair; Tappan, J. Submitted October 17, 1916. (Docket No. 153.) Decided December 22, 1916.

Bill by Donald MacQueen against the city commission of the city of Port Huron and others to restrain the issuance of bonds for school purposes. From a decree dismissing the bill, complainant appeals. Reversed, and decree entered.

*Thomas Wellman,* for complainant.

*Burt D. Cady,* City Attorney, for defendants.

Steere, J. Plaintiff, a resident elector and taxpayer of the city of Port Huron, filed this bill of complaint, asking injunctive relief to prevent the commission of that city from negotiating and selling a $100,000 issue of its bonds for the purpose of providing funds with which to purchase a site and erect a new schoolhouse thereon, for which preliminary steps had been taken under and as prescribed by its city charter.

In outline, the city commission of Port Huron, acting under its charter on a requesting resolution of the board of education of that city, declared by resolution of date December 17, 1915, that a necessity existed for borrowing the sum proposed for the purpose stated "on the faith and credit of the city of Port Huron and the faith and property of the board of education" and issuing bonds of the city therefor, and called a special election of the "qualified electors of said city" to be held on the 31st day of January, 1916, to vote upon the proposed bond issue. An election was held on the day named, and the proposition to issue said bonds was indorsed by a three-fifths majority of the electors of the city voting at said election. A form of bond was prepared and adopted by the city commission, which recited, among other things, that "the full faith, credit and resources of the city of Port Huron are hereby irrevocably pledged" for prompt payment of principal and interest, and that "said series of 100 bonds of which this is one has been issued for the purpose of providing moneys for its educational fund." Bids were asked for, and several had been received when this suit was commenced.

No question appears to be raised as to the charter provisions having been followed in these preliminary proceedings, which therefore need not be reviewed in detail, but it is contended by plaintiff that through the transition of the city of Port Huron, on January 1, 1911, from its old form of government under a char-

ter granted by the State legislature to a commission form of government under a new charter adopted by its electors pursuant to the so-called "home rule" act, the city was divested of all authority to borrow money for school purposes, and the school organization lost whatever previously existing legal entity it possessed.

The objections urged and argued against the validity of the proposed bond issue, as summarized from plaintiff's bill and brief, are:

"(a) The issuance of the bonds is *ultra vires;* (b) They are not for a municipal purpose; (c) the city cannot pledge the property of the board of education for their payment; (d) the proposition was not submitted to the electors of the school district of the city of Port Huron; (e) the board of education is not a legally constituted board; and (f) there was no request for the issuance of the bonds from a legally constituted board."

It was attempted by a chapter of the new home rule charter to continue the city schools along the lines provided in the old charter, so far as adaptable to the changed organization of the city, which resulted amongst other things in reducing the school board from 14 to 4 members and in putting the responsibility for and control of school finances, and also the selection and appointment of members of the board of education, in the hands of the city commission, instead of the common council, which the commission succeeded as the governing body of the city when the new charter went into effect on January 1, 1911. By a provision of this new charter the city was composed of but one ward, and its adoption appears to have been claimed to automatically reduce the number of members of the school board to 4.

When the new home rule charter went into effect and the city government was reorganized to operate under it with the 11 wards, each of which was represented by a member of the school board, reduced to

one, the charter commission apparently assumed, and by resolution declared, that a vacancy existed in the offices of all members of the school board who had held under the former charter, and appointed a new board consisting of 4 members, composed of the mayor, two inspectors at large, and 1 member from the then single ward of the city. The board of education so chosen, with its successors, has continued as the acting school board until the present time.

The city of Port Huron was incorporated in 1857 by a local act of the legislature (Act No. 46, Laws 1857). The charter then granted contained no chapter devoted to the details of a school system, but in section 5, included amongst the officers to be chosen "in and for the said city" were "one recorder who shall be *ex officio* school inspector" and two school inspectors, and section 39 provided:

"The city of Port Huron for all purposes in regard to common schools and school money, shall be deemed a township; and the recorder shall discharge all the duties and be subject to all the liabilities of a township clerk. The city treasurer and school inspectors shall discharge the duties of such corresponding officers except the collection of taxes."

Under the general laws of the State, township boards of school inspectors within their respective school districts were and are given large discretionary powers in the establishment and control of schools, the levying of taxes for their maintenance, and the management and disposition of school funds, and the school board of Port Huron as inaugurated possessed such rights, powers, and independent control of educational affairs within the city; but during the years which intervened between that time and the adoption of the home rule act for cities the charter of Port Huron underwent some 15 amendments and revisions at the hands of as many different legislatures, in the progress

of which various changes were made in the school system, subordinating it more directly to dependence upon and control by the city government. The suggestion in *Hatheway* v. *Sackett*, 32 Mich. 97, that "strict regulations are necessary to prevent our city and village organizations from drawing to themselves the supervision of the common schools within their borders" was seemingly overlooked or not seriously regarded. Under the old city charter as it stood when the new went into effect on January 1, 1911, the school board was yet a body corporate by the name of the board of education of the city of Port Huron, with its authority and activities limited to running the schools with whatever funds the city raised and turned over to it for that purpose. By its charter the city was vested with exclusive authority to raise, by city taxation, revenue for school purposes and to issue city bonds for the purchase of sites and erection of school buildings, while the board of education was authorized to spend the same, when received, for educational purposes; all members of the school board were appointed by the common council of the city except the mayor, the only member chosen by popular election, who became *ex officio* president of the board; the city clerk and city treasurer were *ex officio*, respectively, secretary and treasurer of the board. While the school board could recommend, it rested with the city to issue bonds for the purchase of new grounds, erection of new buildings, and to levy and collect taxes for school purposes, the latter mandatory only to a certain minimum rate *per capita* of school children. As to borrowing and bonding, the old charter further provided:

"The common council shall, with the approval of the board of estimates, also have power to provide money for the water fund, the sewer fund, the educational fund, * * * by borrowing upon the faith and credit of said city and upon the best terms that

can be made, such sums of money as shall be deemed necessary and expedient, and to issue the bonds of the city therefor. And the common council shall have power to provide money by borrowing on the faith and credit of the city to pay the present bonded indebtedness of the city or of the board of education or any part thereof, whether due or not, and to issue bonds therefor; or said bonds may be issued by the common council for the purpose of refunding said bonded indebtedness and exchanged for the present outstanding bonds of the city or board of education. * * *

"Bonds issued under the preceding section shall be respectively denominated water bonds, sewer bonds, school building bonds, public building bonds," etc. Act No. 390, Local Acts 1885, chap. 15, §§ 6, 7.

Amongst the funds into which the revenues and moneys of the city were required to be divided was included:

"*Eighth.* Educational fund, to defray the expenses of maintaining the public schools in said city, and of obtaining grounds, erecting and repairing buildings. * * *" Act No. 390, Local Acts 1885, chap. 15, § 1, subd. 8.

The result of this legislation was that for some time prior to the adoption of the new charter the board of education had in effect become divested of all power to raise funds for the maintenance of the schools, its authority, control, and duties being limited chiefly to ministerial matters in conducting the schools, while the city had, primarily, authority to raise, and absolute control over, the revenue for school purposes, except the minimum which it was required to raise for ordinary expenses.

The public school system of this State and the general policy in regard to it, as evidenced by constitutional and legislative provisions, has too often been reviewed and discussed in former decisions of this court to call for extended consideration or citation of au-

thorities, but there are a few well-recognized basic principles in the education organization and policy of the State which are to be borne in mind in connection with the questions raised here.

Fundamentally, provision for and control of our public school system is a State matter, delegated to and lodged in the State legislature by the Constitution in a separate article entirely distinct from that relating to local government. The general policy of the State has been to retain control of its school system, to be administered throughout the State under State laws by local State agencies organized with plenary powers independent of the local government with which, by location and geographical boundaries, they are necessarily closely associated and to a greater or less extent authorized to co-operate. Education belongs to the State. It is no part of the local self-government inherent in the township or municipality except so far as the legislature may choose to make it such. *Belles* v. *Burr,* 76 Mich. 1 (43 N. W. 24) ; *Attorney General* v. *Board of Education,* 154 Mich. 584 (118 N. W. 606). The general school laws were carefully planned and enacted to guard that distinction; provision was made for organization of the common school districts, with officers elected at school meetings by electors with defined qualifications, and who as a school board were given large plenary powers and control of school matters, practically independent from the local government of municipalities in which the schools were situated.

In recognition of the demand, and often evident necessity for, graded, union, and high schools in large centers of population organized into cities and villages, many local and special laws were passed, organizing their schools according to local requirements or desires, frequently as a chapter of the municipal charter granted to the municipality in which the school was

located. In some of these, unusual powers are given the board of education, even to bonding the district without submitting the question to the electors, while in others are indicated concessions to the previously noted tendency of city or village organizations to draw to themselves "the supervision of the common schools within their borders," as in the instant case. Such was clearly within the power of the legislature. With whether it was good or bad policy we are not concerned. But here, as in all such cases so far as we can discover, the school board yet retained its entity as an involuntary public corporation, or *quasi* corporation, organized with limited powers for strictly educational purposes, and governed, aside from the plain provisions of the special act, by the general school laws of the State which provide (section 4774, 2 Comp. Laws; 2 Comp. Laws 1915, § 5760) as follows:

"All provisions of this act shall apply and be in force in every school district, township, city and village in this State except such as may be inconsistent with the direct provisions of some special enactment of the legislature."

It was not within the power of the electors of the city of Port Huron to dissolve, or alter in the essentials of its creation for educational purposes, the corporate body known as the board of education of Port Huron, or to relieve the city of its obligations in that connection by a change in the local form of government for the city through adoption of a new charter under the home rule law. That law (Act No. 279, § 4, Pub. Acts 1909) guarded this as follows:

"Each city may in its charter provide:  *  *  * (*f*) For the establishment of any department that it may deem necessary for the general welfare of the city, and for the separate incorporation thereof: *Provided, however,* That these provisions shall not be construed to extend to public schools;  *  *  *  (*p*) For

altering, amending or repealing any special act affecting any existing municipal department, but the department in control of the public schools shall not be construed to be a municipal department" (amended in form, but not in substance, by Act No. 210, Pub. Acts 1915, 1 Comp. Laws 1915, § 3307).

The change in its charter did not change the corporate entity of the city of Port Huron. It continued with all its rights, powers, and obligations as they existed under the old charter except as other provisions were lawfully made, either by the electors in matters strictly pertaining to local government within the limits of the home rule law, or by the legislature of the State in matters of State concern where general laws were or might become applicable. *Detroit Common Council* v. *Engel*, 187 Mich. 88 (153 N. W. 537). It was manifestly contemplated in the general act that in adopting a home rule charter radical alterations would or might be made in the forms of local government necessarily resulting in changes in numbers, names, and duties of city officials and departments. So long as the city in its reorganization provided for and furnished qualified officials to carry out its obligations relating to school matters as imposed by the old charter, that such officials were designated by other titles or in strictly local matters may have performed other duties than were imposed upon the officials named in the old charter may be regarded as anticipated, and immaterial so long as the new local bodies or officials were vested with the same powers and burdened with the same duties in relation to school matters as those designated under the old charter, for whom they were substituted.

The home rule law (section 3) (1 Comp. Laws 1915, § 3306) states that:

"Each city charter shall provide  *  *  *  (*d*) For the establishment of one or more wards."

Under the old charter the city council had authority to lay out and change its wards. When the legislature granted authority to the people of a city to reduce the number of its wards to one in adopting a new charter, it presumptively contemplated as a natural consequence that when this was done, as in the instant case, the number of members of the board of education might change accordingly; otherwise the board of education was constituted as before, with the mayor of the city *ex officio* president, 2 members at large and 1 from the remaining ward elected or appointed by the governing body of the city composed, however, of a city commission, which took the place of the former city council. Whatever irregularities may have occurred at the time of change to the new charter, the selection of the members of the school board and their appointment, so far as related to their qualifications and election or appointment by the governing body of the city was concerned, were in compliance with the requirements of the old charter, as well as the new. They, with at least colorable rights to the office, and their successors, have continued to act until the present time, a period of over five years, certainly from the beginning as the *de facto,* and we think now as the *de jure,* school board of the city, with all the rights, powers, and duties granted to and imposed upon school boards by the general school laws, except such as are inconsistent with some special enactment of the legislature. Section 5 of Act No. 31, Pub. Acts 1909 (2 Comp. Laws 1915, § 5652), provides:

"Every school district shall in all cases be presumed to have been legally organized when it shall have exercised the franchises and privileges of a district for the term of two years; and such school district and its officers shall be entitled to all the rights, privileges and immunities, and be subject to all the duties and liabilities conferred upon school districts by law."

While it is urged by plaintiff and denied by defendants that the new charter contains language prohibiting the city from pledging its credit or raising city revenue by taxation to be turned over to the school board for educational purposes, we regard that question as immaterial here, for the reason that the electors of Port Huron had no power, when adopting their new charter, to embody in it any provision relieving the city of rights, duties, and obligations granted or imposed by the legislature upon it as a State agency in relation to that part of the public schools within its borders.

The legislature of the State did, however, have power in its discretion to increase or decrease such authority by a public law of general application to cities of the class in which defendant falls; and, as to bonding, we are unable to escape the conclusion that it has relieved the city of that duty and precluded it from that right by Act No. 150, Pub. Acts 1915 (2 Comp. Laws 1915, §§ 5865, 5866), entitled:

"An act to prescribe and limit the power of school districts having a population of more than 15,000 and less than 100,000 to borrow money and issue bonds of such district therefor, and to repeal all acts and parts of acts inconsistent therewith."

That the school district of the city of Port Huron contains within its limits a population exceeding 15,-000 and less than 100,000 is unquestioned. The act is concise, consisting of two short sections which are as follows:

"SECTION 1. Any school district within the State of Michigan, whose population shall exceed 15,000 and be less than 100,000, shall have power and authority to borrow money and issue bonds to an amount not greater than five per cent. of the total assessed valuation of said district. Subject, however, to all provisions of law now or hereafter in force relative to the submission to the electors of such districts of any or

all questions relative to such borrowing of money and issuing of bonds therefor.

"SEC. 2. All acts or parts of acts, whether local or general, in any wise conflicting with the provisions of this act are hereby repealed."

The provision of the old charter of Port Huron, authorizing the city to bond for school purposes and precluding the school district from doing so, is a part of a local act, manifestly conflicting with the provisions of this act.

The complications in connection with city schools which adoption of new charters under the home rule law have given rise to, or threatened, suggest the propriety of this legislation, which in an important particular makes definite the independent power of school boards, tends towards greater uniformity in the school laws, and as a whole sounds in harmony with the general policy of the State in educational matters.

Whatever diversity of views may have heretofore arisen, it is now authoritatively settled in this State that a general law is not unconstitutional because based upon classification of school districts according to population. *Burton* v. *Koch,* 184 Mich. 250 (151 N. W. 48).

It is suggested that the act is unconstitutional because its object is not expressed in its title; and it embraces more than one subject in the particular that it purports to take from one governmental agency the power to borrow money for school purposes and confer it upon another, and it also limits the amount which may be borrowed by the other, also reducing the limits for school districts as fixed by the general law from 10 to 5 per cent. of the assessed valuation of the district.

We think those matters are but detail, clearly germane to the declared general purpose of the act, which is to confer exclusive authority upon all school dis-

tricts of population within a defined limit to borrow money for school purposes up to a certain percentage of the assessed valuation of their respective districts. The title of this concise law fairly gives notice of and points to the subject dealt with in its two brief sections, and of the ultimate object intended.

The wording of the act is clear and plain. It is within the power of the legislature. It declares the law in distinct language. It is a cardinal rule that the legislature must be held to intend the meaning which it has plainly expressed, and in such cases there is no room for construction, or attempted interpretation to vary such meaning.

Agreeable to the reasons stated, we are constrained to conclude that the issuance of bonds by the city for school purposes is now *ultra vires;* and that such authority rests only with the board of education of the city of Port Huron, which by the general school law is authorized under its provisions to take the prescribed action to that end and, if ratified by a plebiscite of the qualified electors of the school district as defined in the general law, has power to borrow money for the purpose proposed to the limit specified in the act quoted.

The decree of the trial court is therefore reversed, without costs, and a decree may be entered herein, granting plaintiff the restraint prayed for as to the contemplated issuance of bonds by the city.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, and BROOKE, JJ., concurred. PERSON, J., did not sit.